******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RECALL TOTAL INFORMATION MANAGEMENT,
INC., ET AL. *v.* FEDERAL INSURANCE
COMPANY ET AL.
(AC 34716)

Lavine, Keller and Sullivan, Js.

*Argued October 11, 2013—officially released January 14, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Complex Litigation Docket, Berger, J.)

*Edmund M. Kneisel*, pro hac vice, with whom were
*Lawrence G. Rosenthal*, and, on the brief, *Matthew T.
Wax-Krell*, and *Brian K. Epps*, pro hac vice, for the
appellants (plaintiffs).

*Melicent B. Thompson*, with whom was *Eric S. Lank-
ton*, for the appellee (named defendant).

*Robert D. Laurie*, with whom, on the brief, was *Eliza-
beth F. Ahlstrand*, for the appellee (defendant Scotts-
dale Insurance Company).

*Opinion*

LAVINE, J. This breach of an insurance contract dispute involves the interpretation of a personal injury clause in a commercial general liability policy. The plaintiffs, Recall Total Information Management, Inc. (Recall) and Executive Logistics, Inc. (Ex Log), appeal from the grant of summary judgment in favor of the defendants, Federal Insurance Company (Federal) and Scottsdale Insurance Company (Scottsdale).[1] On appeal, the plaintiffs claim that the trial court improperly construed the insurance contract at issue by concluding that (1) the defendants did not have a duty to defend, and (2) the losses associated with a data-loss incident were not personal injuries. We affirm the judgment of the trial court.

The following facts, as agreed to in the parties' stipulation of facts, are germane to the resolution of this appeal. In October, 2003, Recall entered into a vital records storage agreement with International Business Machines (IBM) whereby Recall agreed to transport and store various electronic media belonging to IBM. In February, 2006, Recall entered into a subcontract with Ex Log to provide transportation services for the electronic media. Under the subcontract with Recall, Ex Log was required to maintain various insurance policies, including a $2 million commercial general liability policy and a $5 million umbrella liability policy, all naming Recall as an additional insured. The defendants issued the required insurance.[2]

On February 23, 2007, Ex Log dispatched a transport van to move computer tapes (tapes) from an IBM facility in New York to another location. During transport, a cart containing the tapes fell out of the back of the van near a highway exit ramp. The parties agree that approximately 130 of the tapes were removed from the roadside by an unknown person and never recovered.

The tapes that were never recovered contained employment-related data for some 500,000 past and present IBM employees. This information included social security numbers, birthdates, and contact information. After being notified that the tapes had been lost, IBM immediately took steps to prevent harm from any dissemination of this personal information. These steps included notification to potentially affected employees and the establishment of a call center to answer inquiries regarding the lost data. IBM also provided those who could be affected by the loss with one year of credit monitoring to protect against identity theft. IBM claimed a total of more than $6 million in expenses[3] for the mitigation measures it took and entered into a negotiated settlement with Recall for the full amount of the loss.

Thereafter, Recall sought indemnification from Ex Log. Ex Log then filed claims against the policy, but

the defendants denied coverage. Following the denial of coverage, Recall and Ex Log entered into a settlement agreement and on June 22, 2009, Ex Log signed a promissory note in favor of Recall for $6,419,409.79 and assigned all of its rights under the policy to Recall.

The plaintiffs commenced the present action against the defendants on July 24, 2009. The complaint alleged several counts, including breach of an insurance contract. The defendants filed motions for summary judgment with respect to the count alleging breach of an insurance contract on the ground that, as a matter of law, they had no duty to defend and that the plaintiffs' loss was not covered by the policy. The trial court granted the motions for summary judgment, concluding that the defendants had not waived their coverage defenses and that the plaintiffs' losses were not covered under either the property damage or the personal injury provisions of the policy.

With respect to whether the defendants had waived their coverage defenses, the trial court concluded that, under the policy, the defendants only had a duty to defend against a "suit." The trial court found that the term "suit" was unambiguous and declined to interpret that term to include mere negotiations. The trial court then turned to whether the loss associated with the lost tapes was covered under the terms of the policy. The trial court addressed whether the loss was covered under the property damage provision of the policy and determined that the data loss constituted intangible property, which was expressly excluded from coverage.[4]

Next, the trial court addressed whether there was coverage under the personal injury provision of the policy. The trial court noted that the plaintiffs did not allege that the information contained on the tapes was ever accessed by anyone following the incident in which the tapes were lost. Accordingly, the trial court reasoned: "[T]here has also been no injury to a person. IBM paid notification costs, but IBM is not a person[5] and there is no allegation that its right to privacy was violated. Additionally, there is no evidence—even now, some four years after the incident—that any person suffered identity theft or that the privacy of any IBM employee was violated as a result of the loss or theft of the data tapes." The trial court then rendered summary judgment in favor of the defendants. The plaintiffs filed a motion for reargument, which was denied. This appeal followed.[6]

On appeal, the plaintiffs contend that the trial court erred when it construed the policy and concluded that (1) the defendants did not have a duty to defend, and (2) the loss of the tapes did not constitute a personal injury. We disagree.

"Our standard of review of a trial court's decision to

grant a motion for summary judgment is well established. . . . The judgment sought shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . A material fact is a fact that will make a difference in the result of the case. . . . The facts at issue are those alleged in the pleadings. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. . . . [T]he party adverse to such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts. . . .

"While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion . . . a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . On appeal, however, the burden is on the opposing party to demonstrate that the trial court's decision to grant the movant's summary judgment was clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Norse Systems, Inc.* v. *Tingley Systems, Inc.*, 49 Conn. App. 582, 590–91, 715 A.2d 807 (1998). Finally, "[o]ur review of the trial court's decision to grant [a] motion for summary judgment is plenary. . . . Moreover, [c]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo." (Citation omitted; internal quotation marks omitted.) *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 456, 870 A.2d 1048 (2005).

I

We first address the issue of whether the defendants have waived their coverage defenses. The plaintiffs contend that the trial court erred in ruling that the defendants did not have a duty to defend. The trial court found, on the basis of the policy, that the defendants had not breached their duty to defend, and consequently, had not waived their coverage defenses pursuant to our Supreme Court's ruling in *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 160, 681 A.2d 293 (1996) (when insurer breaches duty to defend, insurer will be bound when insured enters into settlement agreement in good faith). On the basis of our own construction of the policy, we agree with the trial court.

"Where, as in the present case, an insured alleges that an insurer improperly has failed to defend and

provide coverage for underlying claims that the insured has settled the insured has the burden of proving that the claims were within the policy's coverage . . . ." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 55, 730 A.2d 51 (1999).[7]

The policy provides, in relevant part, that: "[s]ubject to all of the terms and conditions of this insurance, we will have the right and duty to defend the insured against a suit, even if such suit is false, fraudulent, or groundless." The policy defines a "suit" as "a civil proceeding in which damages, to which this insurance applies are sought . . . [and] includes arbitration or other dispute resolution proceeding . . . to which the insured must submit or does submit with our consent."

The plaintiffs' claim is based on the following additional facts. Following the incident in which the tapes were lost, IBM retained a consultant and took remedial actions. IBM also made a demand against Recall on March 30, 2007, for all of the costs that it incurred or would incur in connection with the lost tapes. Recall, as an additional insured under Ex Log's policy, notified the defendants of IBM's demand; however, both of the defendants denied coverage and declined to participate in the negotiations between IBM and Recall. On April 28, 2008, the negotiations concluded and Recall agreed to reimburse IBM $6,192,468.30.

Recall maintains that it engaged in nearly two years of settlement negotiations—first with IBM, then with Ex Log—and that such negotiations constituted a "suit" or "other dispute resolution proceeding," which the defendants had a duty to defend. The plaintiffs argue that because the defendants have breached their duty to defend, they are liable for the full amount of Recall's settlement with IBM. We do not accept this unduly broad reading of the policy.

"[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. . . . This rule of construction may not be applied, however, unless the policy terms are indeed ambiguous." (Internal quotation marks omitted.) *National Grange Mutual Ins. Co.* v. *Santaniello*, 290 Conn. 81, 88–89, 961 A.2d 387 (2009).

On the basis of a plain reading of the policy, we cannot conclude that the term "suit" or phrase "other dispute resolution proceeding" was meant to encompass the mere negotiations that took place in this case. First, the plaintiffs fail to cite any authority for this interpretation. Second, such an interpretation would create internal inconsistency within the policy as it would merge the term "claim" with "suit." For example, under the express terms of the policy, the insured owes a duty to the insurer to provide notice of both "claims" and "suits," but the insurer only has the duty to defend against "suits." Our Supreme Court has held that "a demand letter from a potential plaintiff in a personal injury action is a claim. Such a demand letter falls short of a suit, broadly defined as 'an attempt to recover a right or claim through legal action' . . . because it has no immediate legal effect and therefore cannot be considered legal action." (Citation omitted; emphasis omitted.) *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, supra, 273 Conn. 469.

Thus, to construe "suit" to include mere negotiations following a demand, would obliterate the distinction between "suit" and "claim." This construction must be rejected. "A construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent." (Internal quotation marks omitted.) *Hansen* v. *Ohio Casualty Ins. Co.*, 239 Conn. 537, 548, 687 A.2d 1262 (1996).

We also share the concern articulated in the trial court's memorandum of decision: "If the [settlement negotiations] [were] found to be an 'other dispute resolution proceeding,' every discussion, however informal, between an insured and a third party could be deemed a dispute resolution proceeding." We decline to give the word "suit" such an expansive reading so at odds with its usual usage.

Finally, even if the phrase "other dispute resolution proceeding" included the negotiations that took place in the present case, this alone would not trigger the duty to defend as the policy requires that the defendants consent to the proceeding. As there is no genuine issue of material fact that the defendants did not consent to the negotiations, the duty to defend was not triggered. We agree with the trial court that the defendants have not breached their duty to defend and thus have not waived their coverage defenses.

## II

We next address the plaintiffs' claim that the trial court erred in its interpretation of the policy. The plaintiffs maintain that the personal injury provision in the policy covered the cost of notifying the affected employees following the loss of the tapes. Specifically, the plaintiffs claim that (A) the loss of the tapes constitutes personal injury as defined in the policy, and (B) the loss of the tapes triggered the remedial provisions of certain state privacy laws, such that personal injury can be presumed. We disagree.

## A

In determining whether the trial court properly concluded that there was no coverage under the personal injury provision of the policy, we must examine the language of the policy as it applies to the facts alleged in the pleadings and averred in the parties' affidavits submitted in conjunction with the summary judgment proceedings. See *Missionaries of the Co. of Mary, Inc.* v. *Aetna Casualty & Surety Co.*, 155 Conn. 104, 110, 230 A.2d 21 (1967). In interpreting the language of the policy, we rely on the principles of construction as set forth in part I of this opinion.

The policy provides, in relevant part: "[W]e will pay damages that the insured becomes legally obligated to pay by reason of liability: imposed by law; or assumed in an insured contract; for advertising injury or personal injury to which this coverage applies." The policy defines "personal injury" as: "injury, other than bodily injury, property damage or advertising injury, caused by an offense of . . . electronic, oral, written or other *publication* of material that . . . violates a person's right to privacy." (Emphasis added.)

Turning to the complaint, the plaintiffs allege: "[b]y virtue of the loss and theft of the IBM tapes . . . the personal information that was stored on the tapes, including social security information and other private data, has been *published* to the thief and/or other persons unknown . . . thereby subjecting [the plaintiffs] to potential claims and liability . . . including liability for the cost of notifying the persons whose data was lost and for providing credit monitoring services to persons who requested it." (Emphasis added.)

On the basis of our review of the policy, we conclude that personal injury presupposes *publication* of the personal information contained on the tapes. Thus, the dispositive issue is not loss of the physical tapes themselves; rather, it is whether the information in them has been *published*. The plaintiffs contend that the mere loss of the tapes constitutes a publication, and has alleged that the information was *published* to a thief. The plaintiffs have failed to cite any evidence that the information was published and thereby failed to take their allegation beyond the realm of speculation. See, e.g., *Norse Systems, Inc.* v. *Tingley Systems, Inc.*, supra, 49 Conn. App. 591 (speculation or conjecture will not overcome motion for summary judgment). As the complaint and affidavits are entirely devoid of facts suggesting that the personal information actually was accessed, there has been no publication.

The plaintiffs argue that the trial court used an improper definition of publication when it construed the definition of personal injury. In its memorandum of decision, the trial court held that publication required communication "to a third party," adopting the definition of publication our Supreme Court has instructed we use in the defamation context. See *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, 247 Conn. 801, 810, 724 A.2d 1117 (1999).

The plaintiffs urge that we adopt the definition of publication set forth in Webster's Third New International Dictionary, which defines publication as the "communication (as of news or information) to the public." Even if we accept this definition, however, our analysis would remain unchanged. Regardless of the precise definition of publication, we believe that access is a necessary prerequisite to the communication or disclosure of personal information.[8] In this regard, the plaintiffs have failed to provide a factual basis that the information on the tapes was ever accessed by anyone.

There is nothing in the record suggesting that the information on the tapes was ever accessed by anyone.[9] A letter from IBM to the affected employees, a copy of which accompanied the affidavit of Dawn Zanfardino, a data privacy manager at IBM, stated: "We have no indication that the personal information on the missing tapes, which are not the type that can be read by a personal computer, has been accessed or has been used for any improper purpose." Moreover, because the parties stipulated that none of the IBM employees have suffered injury as a result of the tapes being lost, we are unable to infer that there has been a publication. As there is no genuine issue of material fact that there was publication, we agree with the trial court that the settlement Recall reached with IBM was not covered under the policy's personal injury provision. See *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, 256 Conn. 343, 356, 773 A.2d 906 (2001) ("[w]here a plaintiff cannot

prove a fundamental element of the underlying tort, e.g., defamation, a claim for personal injury coverage will be denied").

B

Finally, the plaintiffs claim that certain statutes required IBM to notify its affected employees of the data loss and that the triggering of those statutes are "presumptive invasions of privacy." Essentially, the plaintiffs contend that when such a notification statute is triggered, there has been an invasion of privacy. We disagree with this logic.

The plaintiffs cite two statutes, one in New York; N.Y. Gen. Bus. Law § 899-aa (2) (McKinney 2005); and one in Connecticut; General Statutes § 36a-701b; both of which require certain actions be taken when personal information is compromised.

In this case, IBM claims to have suffered a loss of more than $6 million related to the alleged compliance with these notification statutes. While we do not speculate as to whether these expenditures were required by law, we conclude that they do not constitute a personal injury as defined in the policy. These notification statutes simply do not address or otherwise provide for compensation from identity theft or the increased risk thereof, they merely require notification to an affected person so that he may protect himself from potential harm. Accordingly, merely triggering a notification statute is not a substitute for a personal injury. See, e.g., *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, supra, 256 Conn. 376 (coverage cannot extend to "other torts, not specifically enumerated, which bear [only] some similarity to those listed in the policy" [internal quotation marks omitted]). We therefore conclude that the trial court properly granted the defendants' motions for summary judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Sinclair Risk and Financial Services, LLP, was a defendant before the trial court but is not a party to this appeal.

[2] Federal issued a commercial general liability policy containing a per occurrence limit of $1 million and an aggregate limit of $2 million. Scottsdale issued a commercial liability umbrella policy containing a per occurrence limit of $4 million. Although these are two separate policies, the relevant provisions are nearly identical. For the purposes of this opinion, we use the term "policy" in the singular and quote the language from the policy issued by Federal.

[3] In addition to providing credit monitoring to the affected employees, IBM provided credit restoration to some of its employees. The parties agree that no identity theft incident could be traced to the loss of the IBM tapes, however.

[4] This determination is not challenged on appeal.

[5] We interpret the court's statement to mean that IBM is not a person for the purposes of privacy law. See 3 Restatement (Second), Torts, Invasion of Privacy § 652I, comment (c), p. 403 (1977) ("[a] corporation, partnership or unincorporated association has no personal right to privacy").

[6] The parties stipulated that the remaining counts alleged against the defendants are not viable in the absence of a breach of an insurance contract. The trial court rendered judgment in accordance with the parties' stipulation.

Thus, there has been a final judgment for the purposes this appeal. See Practice Book § 61-3.

[7] The settlement agreement between IBM and Recall specifically did not waive Recall's liability to IBM for "any future claim by IBM for indemnity from Recall for monetary damages paid by IBM . . . ."

[8] We observe that the term publication may carry slightly different meanings depending on the particular privacy right at issue. As the precise definition of publication is not essential to our disposition of this appeal, we express no opinion as to whether the trial court properly adopted the definition as set forth in *Springdale Donuts*, *Inc.*, and in the context of defamation.

[9] Indeed, there is nothing in the record that suggests the unknown party even recognized that the tapes contained personal information.

---